811 So.2d 189 (2002)
STATE of Louisiana, in the Interest of W.H.V., Plaintiff-Appellant,
v.
J.A.V. and C.V., Defendants-Appellees.
No. 35,887-JAC.
Court of Appeal of Louisiana, Second Circuit.
February 27, 2002.
*190 Paul J. Carmouche, District Attorney, W. Glen Mangham, Assistant District Attorney, for Appellant, Department of Social Services, State of Louisiana.
W. Allen Haynes, for Appellee, J.A.V.
Wilbert D. Pryor, Shreveport, for Appellee, C.V.
Lunn, Irion, Salley, Carlisle & Gardner, by James A. Mijalis, Shreveport, for W.H.V.
Before BROWN, CARAWAY and PEATROSS, JJ.
PEATROSS, Judge.
This is an appeal by the Department of Social Services ("Department") from the ruling of the trial court finding that the Department failed to prove by a preponderance of the evidence that W.H.V. is a child in need of care. Counsel for W.H.V. is aligned with the Department in challenging the judgment of the trial court. For the reasons stated herein, the judgment of the trial court is reversed.

FACTS
W.H.V. was born May 19, 2001, and was discharged from the hospital on May 23, 2001. Over the course of the following three weeks, W.H.V. was in the exclusive care and control of his parents, J.V. (the *191 mother) and C.V. (the father), and his maternal grandmother. On June 2, 2001, the grandmother had traveled to Shreveport from Ohio to help with the care of W.H.V. On June 12, 2001, the grandmother returned to OhioJ.V. and W.H.V. took her to the airport around 11:00 a.m. that day. C.V. had returned to work and was not home for the remainder of that afternoon. Around 8:00 p.m. on June 12th, J.V. noticed that W.H.V.'s left leg was "twitching." She called her husband, who encouraged her to call the child's pediatrician. J.V. placed a call to Mid-City Pediatrics' answering service, which alerted Dr. Robert Haynie, the on-call doctor that evening. J.V. also called her mother in Ohio to inquire if she had any ideas as to what could be wrong with the child. When Dr. Robert Haynie returned J.V.'s call, around 10:00 p.m., C.V. was just coming in from work. Dr. Robert Haynie advised J.V. to bring the child in to his office the next morning. Around 3:00 a.m., however, when J.V. awoke to feed the baby, she noticed increased "twitching" on the entire left side of W.H.V.'s body. She and C.V. took W.H.V. to Christus Schumpert Medical Center's ("Schumpert") emergency room where it was determined that W.H.V. was experiencing seizures. Dr. Robert Haynie examined W.H.V. at approximately 7:00 a.m. on June 13, 2001. A CT scan, nuclear bone scan and x-rays revealed intracranial hemorrhage (subarachnoid and subdural), eight fractured ribs, a fracture of the left ankle and a metacarpal fracture in the right thumb.
On June 14, 2001, the Department received a report of suspected abuse from Schumpert and began an investigation. An instanter order was obtained, removing W.H.V. to the temporary custody of the Department. At the continued custody hearing, the trial judge returned the child to the parents and a petition seeking to adjudicate the child as one in need of care was filed by the Department. Two supplemental affidavits requesting that the child be removed from the parents were denied. The matter proceeded to trial, where expert testimony was adduced along with the testimony of the parents and grandmother.
Dr. Scott Ritch, a pediatrician, testified that he was the first medical doctor to examine W.H.V. after his birth. He noted no abnormalities, but indicated on his report that W.H.V. was born with some splinter bleeding on his back, head molding and a caput seccedaneum ("caput"). The splinter bleeding, according to Dr. Ritch, is when small capillaries burst just under the skin. Head molding occurs during a vaginal birth from passage through the birth canal and usually resolves within six to twelve months of birth. Dr. Ritch further explained that a caput is superficial bleeding right beneath the scalp due to the head being pressed against the intrauterine or intravaginal wall for a long period of time. A caput is consistent with bruising or abrasions on the scalp, which was apparent on a photograph of the infant just after birth. Dr. Ritch testified that the abrasions were caused by scraping on the pelvic bones during labor. On direct examination, Dr. Ritch indicated that the caput is seen in about 50-60 percent of newborns; however, on cross-examination, he stated that percentage to be 1-2 percent. Dr. Ritch found no evidence of seizure or broken ribs and further testified that he had never seen an occasion where multiple ribs were fractured in the birth process. Dr. Ritch acknowledged that, while not technically classified as "prolonged labor" (which is in excess of 16 hours), J.V. did experience a labor of 15 hours, 40 minutes.
As previously stated, the "on-call" pediatrician who took J.V.'s call and saw W.H.V. in the emergency room was Dr. Robert Haynie. In his testimony, Dr. Robert *192 Haynie described W.H.V.'s seizures as rhythmic, but nonviolent. Dr. Robert Haynie ordered a CT scan, which revealed the brain bleed (bleeding in the area between the skull and brain). In his opinion, it was the bleed that was causing the seizures; and, based on the brightness of the bleed on the scan, indicating new blood which had not yet begun to resorb, he determined that the bleed was 8 to 10 days old. He opined that the bleed was too new to have occurred at birth. Dr. Robert Haynie stated that seizures usually occur within 12 hours of the bleed which causes them. He also ruled out other causes such as infection or bleeding disorder and concluded that the bleed was caused by trauma. Dr. Robert Haynie noted the rib fractures, but deferred to a radiologist on the question of the ages of the fractures. He did opine, however, that a long labor would not create a great enough force to break 8 ribs and that, in his 14 years of practice, he had never seen this type of bone injury from birth trauma.
On cross-examination, Dr. Robert Haynie admitted that brain bleeding is possible as a result of birth trauma, but stated that he had only seen one such case and the child was seizing within one hour of birth. He also testified that the external bruising on W.H.V.'s scalp was fairly common. Dr. Robert Haynie also testified that his father, Dr. William Haynie, who was the child's regular pediatrician, had performed a well-baby exam of W.H.V. on June 7th and found no problems.
Dr. Robert Haynie diagnosed W.H.V. with Shaken Baby Syndrome. He explained that, in such cases, the baby would be grasped around the chest and shaken back and forth and that the shaking could be out of frustrationrequiring no meanness, anger or ill will of the perpetrator. When questioned about W.H.V.'s lack of retinal hemorrhaging, Dr. Haynie stated that this fact had no effect on his opinion. He explained that, although the existence of retinal bleeds in a child shows a virtual diagnostic certainty of Shaken Baby Syndrome, the absence thereof, by no means, rules it out.
Dr. Robert Haynie further testified that he found no signs of osteogenesis imperfecta ("OI") or Brittle Bone Disease, in W.H.V.
Dr. Penny Labor is a diagnostic radiologist who read the CT scan, x-rays and nuclear bone scans of W.H.V. She outlined the child's injuries, including four left posterior rib fractures and four right lateral rib fractures, a fracture of the left ankle and metacarpal fracture of the right thumb. From reviewing the nuclear bone scan, Dr. Labor concluded that the left rib fractures occurred at a different time from those on the right, with the right side fractures being newer than the left and having occurred within two weeks of the x-ray, and possibly as recent as the day before. She noted that the left fractures could have occurred at birth, but the right ones were clearly after birth due to the lack of callous formation. She further testified that a baby's ribs are pliable and that breakage such as this (especially the left posterior ribs) would more likely be the result of a direct blow rather than squeezing. There was no external bruising on the child, and Dr. Labor deferred to the pediatricians on whether there would necessarily be external bruising with fractures of the ribs. Dr. Labor also testified that she would have to defer to a pediatrician on the question of whether such fractures could occur at birth. Regarding the bruising and birth trauma questions, she stated, "I'm not a pediatrician, so I don't deal with all these mechanisms. I just read films, ...." Each of the other medical experts who were questioned on the issue of external bruising, testified that there *193 need not be external bruising from the fracturing of ribs. Regarding the ankle fracture, Dr. Labor described it as a "bucket handle fracture", which she testified is only caused by shaking.
Dr. Labor also testified that the whiteness (or bright appearance) of the brain bleed indicated that, in her opinion, the injury was between 72 hours and 14 days old and that the most common cause of such a bleed is trauma. She further explained that a bleed will appear this bright for 7 to 10 days. Regarding OI, Dr. Labor stated that the disease is rare and that W.H.V.'s x-rays showed no signs of the disease.
Dr. Mathew Reagan Green testified as an expert in orthopaedic surgery. Dr. Robert Haynie referred W.H.V. to Dr. Green, who testified that he had reviewed the films with two radiologists and the three of them concluded that the rib fractures were of different ages. Dr. Green did not assign specific ages to the fractures, but did opine that the ankle fracture was caused by trauma which occurred between the 10th and 12th of June. Finally, Dr. Green found no signs of OI in W.H.V.
Dr. John Odita is a pediatric radiologist who reviewed the June 12, 2001 x-rays in court and agreed that the rib fractures on those films appeared to be two to three weeks old. He did not think the fractures could be four weeks old because he could still see the original fracture line on the x-rays. Dr. Odita repeatedly testified that fractures such as these could be caused by grasping and squeezing and that external bruising would not necessarily occur.
Dr. Ann Springer, an expert in pediatrics with extensive experience in child abuse cases, emphatically stated her opinion that this child was a victim of Shaken Baby Syndrome, testifying that this is a "very typical case." Dr. Springer was asked by Child Protection Services of Caddo Parish to evaluate and follow W.H.V. Her testimony is the result of her examination of W.H.V.'s medical records and history and her examinations of the infant after his discharge from the June hospitalization. Dr. Springer concluded that the rib fractures were from the child being grasped around the chest and that the fractures occurred at different times as indicated by the callous formation on the left fractures which was not present on the right fractures. Dr. Springer opined that the fractures, along with the brain bleed and lack of explanation for the injuries, led her to conclude that the cause of the child's injuries was abuse. She further stated that, while birth trauma can cause brain bleeding, the brain bleed would cause seizures within hours of the trauma which caused the bleed and not three weeks "down the line." Dr. Springer opined on several instances in her testimony that this child's injuries were not due to birth trauma, but were the result of shaking. Since such episodes, according to Dr. Springer, are frequently repetitious, she expressed concern that further shaking injury will further jeopardize W.H.V.'s condition or could kill him. The fact that the rib fractures were of different ages prompted her conclusion that the child had been injured more than once, which would increase the likelihood of future injury.
Dr. Springer also testified that the only cause for a bucket handle fracture of W.H.V.'s ankle is shaking. This injury was not critical to Dr. Springer's diagnosis, but corroborated her conclusion.
Dr. Harold Chen testified as an expert in pediatric genetics. Dr. Chen opined that W.H.V. presented no clinical signs of 01. At the time of trial, the DNA marker results were not yet complete, but Dr. Chen testified that he expected the results to be normal.
*194 J.V., C.V. and the grandmother each testified that W.H.V. was in the exclusive care and control of one of these three individuals since his birth. None of these witnesses could provide any explanation for the injuries; they each denied any abuse or accident while the baby was in his/her care. J.V. hypothesized that the difficult birth could have caused the injuries as her only "guess" as to the cause. Each of the three denied abusing W.H.V. and denied any knowledge that one of the others may have abused him. In addition, J.V. testified that she did not remember noticing any signs of seizure activity in W.H.V. since his birth and prior to June 12, 2001. She further stated that, besides being a long labor, the delivery was normal.
Ms. Terri McRae is the Court Appointed Special Advocate ("CASA") volunteer assigned to this case. She visited in the home on several occasions and testified that C.V. was not cooperative with her inquiries. She stated that he avoided meeting with her on several occasions and was not responsive to her questioning when she was in the home. Ms. McRae also testified that she had met with Dr. Labor who advised her that the rib fractures were within 10 and 30 days old.
The medical experts were all in agreement that the seizure activity could not and did not cause the rib fractures.

DISCUSSION
The purpose of Title VI of the Children's Code, "Child in Need of Care," is to protect children whose physical or mental health and welfare is substantially at risk of harm by physical abuse, neglect or exploitation. Ch.C. art. 601. Title VI is intended to provide the
greatest possible protection as promptly as possible for such children; it shall be administered and interpreted to avoid unnecessary interference with family privacy and trauma to the child while, at the same time, to authorize the protective and preventive intervention needed to safeguard and enhance the health and well-being of children.
Id.
La. Ch.C. art. 606A(1) provides:
Allegations that a child is in need of care must assert one or more of the following:
(1) The child is the victim of abuse perpetrated, aided, or tolerated by the parent or caretaker, by a person who maintains an interpersonal dating or engagement relationship with the parent or caretaker, or by a person living in the same residence with the parent or caretaker as a spouse whether married or not, and his welfare is seriously endangered if he is left within the custody or control of that parent caretaker.
The state shall have the burden to prove the allegations of the petition by a preponderance of evidence. La. Ch. C. art. 665; State In Interest of JK, 33,878 (La.App. 2d Cir.6/23/00), 764 So.2d 287, writ denied, 00-2637 (La.10/6/00), 771 So.2d 83. It is not the state's duty to prove its case beyond a reasonable doubt, by clear and convincing evidence or to disprove every hypothesis of innocence.
Under the manifest error standard of review, in reviewing the factual findings of a trial court, an appellate court is limited to a determination of manifest error. Hill v. Morehouse Parish Police Jury, 95-1100 (La.1/16/96), 666 So.2d 612. We are instructed that, before a factfinder's verdict may be reversed, we must find from the record that a reasonable factual basis does not exist for the verdict and that the record establishes that the verdict is manifestly wrong. Lewis v. State, Through Dept. of Transp. and Development, *195 94-2370 (La.4/21/95), 654 So.2d 311; Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993). Although we accord deference to the factfinder, we are cognizant of our constitutional duty to review facts, not merely to decide if we, as a reviewing court, would have found the facts differently, but to determine whether the trial court's verdict was manifestly erroneous, clearly wrong based on the evidence or clearly without evidentiary support. See LSA-Const. Art. 5, section 10(B); Ambrose v. New Orleans Police Department Ambulance Service, 93-3099 (La.7/5/94), 639 So.2d 216. A review of facts is not completed by reading only so much of the record as will reveal a reasonable factual basis for the findings in the trial court, but the reviewing court must consider whether the trial court's findings are reasonable in light of the record taken as a whole. State ex rel. A.C., 99-1943 (La.App. 4th Cir.2/23/00), 772 So.2d 668, writ denied, 00-1231 (La.5/10/00), 761 So.2d 554.
After a very thorough review of the entire record in the case sub judice, we find that the trial court was manifestly erroneous in its conclusions. Again, we are mindful of the deference owed to findings of trial courts under the manifest error standard of review; however, where, as here, critical findings are not supported by competent evidence, this court has a duty to reconsider the actual evidence and render an appropriate judgment after having conducted a de novo review of the evidence. State ex. rel. A.C., supra, citing Gonzales v. Xerox, 320 So.2d 163 (La. 1975).
The trial judge cites the following medical and non-medical reasons for his ruling: (1) the evidence of the parents' innocence; (2) the lack of a reasonable hypothesis of their guilt which is consistent with the objective medical facts; (3) the clear existence of unusual medical birth occurrences, likely in only 1-2 percent of cases, yet having actually occurred in this case; (4) the inconsistent medical opinions on critical timing and causation issues of various interrelated injuries of the child; and (5) the medical feasibility of alternative causation methods for the child's injuries. We will first address the trial court's conclusions concerning the medical evidence presented.
An alleged lack of a reasonable hypothesis of how the parents supposedly injured the child was provided as a reason underlying the trial judge's ruling. As the trial judge noted, "the most common assertion" by the medical experts was that W.H.V. was the victim of shaking. In fact, each of the doctors who examined this infant, and was questioned at trial on the cause of his injuries, testified that W.H.V. experienced some type of external trauma after birth. Dr. Labor did testify that rib fractures such as these, in her opinion, would more likely result from a direct blow rather than grasping and squeezing, but significant in that testimony is that a direct blow is still some sort of external trauma to the child. Dr. Labor also deferred to others on the issue of external bruising associated with rib fractures; but, when pressured by the court for an opinion which she maintained was outside of her field of practice and expertise, she suggested that there would be such bruising. Basically, the trial court concluded that W.H.V. was not shaken because he had no external bruising around the ribs. Such conclusion is simply not supported by the testimony in this case. Dr. John Odita repeatedly testified that fractures such as this could be inflicted with no external bruising. He further testified that he had seen injuries where that was certainly the case. After reaching the conclusion that the ribs were not broken by shaking, the trial judge then totally disregarded Dr. Springer's, and the other medical experts', entire testimony *196 regarding the condition of this injured infant.
Next, the trial court emphasized that there were differences in the opinions various medical experts regarding the exact ages of the rib fractures in this case. There was testimony adduced that different medical minds may place slightly different ages on such fractures, based on their reading of the x-rays and bone scans. What must not be overlooked, however, is that all of the medical experts in this case agreed that the left and right rib fractures were of different ages, indicating at least two traumas to this child. Even more importantly, however, though the precise ages of the fractures differed slightly among the experts, all of the testimony concerning the ages of the fractures placed the fractures having occurred at some point after the birth. No medical testimony was adduced that the rib fractures could be as old as the birth date of W.H.V., with the exception of Dr. Labor's statement that it was possible that the older fractures (on the left side) could have occurred right after birth, but that the right ones were definitely more recent. In that regard, Dr. Odita testified that the right side fractures could not be four weeks old due to the lack of callous formation. We do not find Ms. McRae's recollection of Dr. Labor's alleged statement to her that the fractures could be 30 days old sufficient to totally disregard the overwhelming evidence of trauma in this case. Moreover, Dr. Labor testified that she did not recall making such a statement to Ms. McRae and opined that the fractures were not older than 14 days and occurred, in her opinion, closer to 72 hours prior to the x-rays and bone scan.
The trial court also emphasizes that some of the medical testimony indicated that birth trauma could cause rib injury. Those same doctors, however, testified that that was not the case with W.H.V.'s fractures due to the different levels of healing in the right and left side fractures as shown on the x-rays and bone scan.
The trial court also viewed Dr. Ritch as "unwilling to be totally open and frank" with the court. To the contrary, Dr. Ritch clearly stated that a labor is classified as prolonged if it exceeds 16 hours. J.V.'s labor did not; and, therefore, Dr. Ritch testified that it was not prolonged. He did state, however, that it was just short of being considered prolonged at 15 hours and 40 minutes and did indicate on his written assessment following W.H.V.'s birth that the labor was prolonged. We do not place any significance on the alleged unwillingness to be frank on the part of Dr. Ritch in this regard. We also find that the trial court placed undue weight on Dr. Ritch's inconsistent testimony regarding the percentage of occurrence of caputs in general. The critical fact in Dr. Ritch's testimony is that a caput is purely superficial it is bleeding between the skull and the skin. This testimony, coupled with his testimony that there were no abnormalities immediately after birth and other doctor's and J.V.'s testimony that there were absolutely no signs of injury or seizure exhibited by W.H.V. until almost four weeks after his birth, negate any reasonable hypothesis of birth trauma having caused this infant's injuries. The fact that one doctor was inconsistent on how often this type of superficial condition is seen in newborns is irrelevant to the question of whether the condition was related to a subdural hemorrhage.
Next, the trial judge noted Dr. Robert Haynie's "admission" that brain bleeds can be caused at birth; however, the trial court failed to address Dr. Robert Haynie's testimony, as well as that of the other doctors, that, if a brain bleed occurred during birth, there would be almost immediate onset of seizures, which was not the case with W.H.V.
*197 Finally, the trial judge placed great weight on the fact that W.H.V. did not have retinal hemorrhaging. There is no dispute that W.H.V. did not experience this particular eye injury. Dr. Alan Richards examined W.H.V. on June 13, 2001, and so determined. While he was not called to testify at trial, Dr. Richards' consultation report indicates that he found no evidence of Shaken Baby Syndrome, from his examination. The critical fact regarding Dr. Richards' finding is that he performed an examination of W.H.V.'s eyes only, concluding that, as far as his eyes were concerned, there was no evidence of Shaken Baby Syndrome. We find this insignificant in light of the unanimous testimony of all expert witnesses that retinal hemorrhaging is not required to make a diagnosis of Shaken Baby Syndrome.
At this point, we note that the trial judge repeatedly stated that he did not profess to know the cause of W.H.V.'s injuries. We decline to make such a determination also; however, what the evidence in this case clearly shows is that some type of external trauma injured this infant on more than one occasion while in the exclusive care and control of his parents and grandmother.
Next, the non-medical evidence on which the trial court relied consisted of (1) testimony concerning the loving nature of the parents and the "unblemished" nature of both parents' personal and professional lives, (2) the lack of evidence of abusive behavior toward each other, (3) the lack of evidence of parental knowledge of abuse by the grandmother and (4) the parents' diligent and prompt action in seeking medical care for W.H.V. In this regard, we are not in a position to discredit the veracity of the parents as witnesses. Our review of this record, as described in detail above, leads us to the conclusion that W.H.V. sustained trauma during the time period in which the parents and grandmother, admittedly, had exclusive custody and control of the infant. We must not allow a trial court's belief in the "goodness" of the parent(s) to overshadow the overwhelming medical evidence that this child sustained serious and even life-threatening injuries sometime between his release from the hospital following his birth and nearly four weeks later, when he was again hospitalized with seizures. The parents admitted that W.H.V. was in their, or the grandmother's, exclusive care and control during that entire time period. This record does not support the trial court's conclusion that the Department failed to establish by a preponderance of the evidence that W.H.V. is in need of care. Likewise, we find that it is not a reasonable conclusion on this record as a whole that birth trauma is a plausible explanation for W.H.V.'s injuries. There was no medical evidence presented which tended to prove that W.H.V.'s injuries were birth-related; no medical expert opined that W.H.V.'s injuries were more likely than not due to birth trauma. We believe the minor inconsistencies and areas of concern with the medical testimony expressed by the trial judge in this case are insignificant in light of this entire record. We find that it is in W.H.V.'s best interest that he be adjudicated as a child in need of care so that the Department can continue to evaluate his progress and supervise his home environment. Finding that the trial court's ruling was clearly wrong, we must reverse.

DECREE
For the foregoing reasons, the judgment of the trial court is reversed and W.H.V. is adjudicated as a child in need of care.
REVERSED AND RENDERED.